# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HELENA URÁN BIDEGAIN in her individual capacity and in her capacity as the legal representative of the ESTATE OF CARLOS HORACIO URÁN ROJAS, <br><br> XIOMARA URÁN, in her individual capacity, <br><br> and MAIRÉE URÁN BIDEGAIN, in her individual capacity, <br><br> *Plaintiffs,* <br><br> v. <br><br> LUIS ALFONSO PLAZAS VEGA, <br><br> *Defendant.* | **Civil Action No.** _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Helena Urán Bidegain, in her individual capacity and in her capacity as the legal representative of the estate of her deceased father, Carlos Horacio Urán Rojas, and plaintiffs Xiomara Urán and Mairée Urán Bidegain, in their individual capacity (collectively "Plaintiffs") complain and allege as follows on information and belief:

## PRELIMINARY STATEMENT

1. On the morning of November 6, 1985, approximately 35 members of the M-19 guerrilla group launched an armed attack on Colombia's Palace of Justice in Bogotá – the seat of the nation's two highest courts, the Supreme Court and the Council of State. Over the next two days, the Colombian military engaged in a brutal retaking of the Palace of Justice that left the building largely destroyed and nearly a hundred civilians dead, including eleven justices of the Supreme Court. All but one of the M-19 guerrillas died during the operation.

2. Magistrate Carlos Horacio Urán Rojas ("Magistrate Urán"), an Auxiliary Justice of the Council of State, was among the civilians killed. His brutalized body was found inside the Palace of Justice on November 7, 1985, stripped naked and washed, with a close-range gunshot wound to the temple.

3. In the aftermath of the operation, military officials told Magistrate Urán's family that he had been killed in crossfire during the retaking of the Palace of Justice, an unfortunate victim of circumstance.

4. The military informed grieving families and the public that the high civilian death toll at the Palace of Justice was the result of crossfire between the M-19 guerillas and government forces, and a fire that engulfed much of the Palace of Justice on the evening of November 6, 1985. Many bodies recovered were burned beyond recognition, and missing remains were blamed on the fire.

5. However, the military's explanations were false – fabricated to cover up the unlawful system deployed by the military during the retaking of the Palace of Justice to identify, interrogate, torture and extrajudicially kill or forcibly disappear suspected guerillas or guerilla sympathizers among the hostages who exited the Palace of Justice.

6. Defendant, Luis Alfonso Plazas Vega, a lieutenant colonel at the time, led the military units charged with retaking the Palace of Justice as commander of the Cavalry School in the Colombian Army's 13th Brigade.

7. Under Defendant's command, soldiers stormed the Palace of Justice and took custody of all individuals, including civilian hostages, who were escorted out of the building. Everyone leaving the building was methodically triaged by the military; those suspected of being a guerilla or a guerilla sympathizer were labeled "*especiales*" ("special").

8. Those who escaped the *especiales* designation were transferred to the nearby *Casa del Florero*, the two-story Museum of Independence just steps away from the Palace of Justice. There, they were questioned on the museum's first floor and asked for identification. If nothing aroused the military's suspicions, they were allowed to leave.

9. Those designated as *especiales* suffered a very different fate – one which Defendant and the military tried for years to cover up. The *especiales* were transferred to other military facilities, including the Cavalry School over which Defendant had command and control, where they were interrogated, tortured, and extrajudicially killed or forcibly disappeared.

10. The military attempted to cover up its crimes by disposing of the remains of their victims. Some of the disappeared have never been found. In a few instances, the military returned the bodies to the Palace of Justice and claimed they had died in crossfire during the siege.

11. In the intervening decades, witness testimony, video and documentary evidence, and military radio communications emerged revealing that numerous individuals who were later found dead or whose remains were never recovered were actually escorted out from the Palace of Justice – alive and in the custody of the military.

12. In 2007, a number of Magistrate Urán's personal belongings were discovered hidden in a locked vault inside the 13th Brigade following a court-ordered search of the premises. The search was ordered as part of a criminal investigation into the 13th Brigade's forcible disappearance of eleven cafeteria workers following the Palace of Justice siege.

13. That same year, video evidence and eyewitness testimony emerged establishing that Magistrate Urán had also been escorted out of the Palace of Justice by members of the military, injured but very much alive.

14. In 2011, General Jesus Armando Arias Cabrales ("General Arias Cabrales") was sentenced to 35 years in prison by a Colombian criminal court for his role in the forced disappearance of the Palace of Justice cafeteria workers, a decision later affirmed by the Colombian Supreme Court. Arias Cabrales was the head of the 13th Brigade and gave Defendant command of the mission to retake the Palace of Justice.

15. In 2014, following admissions by the State of Colombia that government actors tortured and disappeared civilians in the retaking of the Palace of Justice, the Inter-American Court of Human Rights found the State of Colombia responsible for torture, forced disappearances, and extrajudicial killings committed as part of the military's retaking of the Palace of Justice, including the extrajudicial killing of Magistrate Urán.

16. The following year, in 2015, Colonel Edilberto Sánchez Rubiano ("Colonel Sánchez Rubiano") was convicted by a Colombian criminal court for his role in the forced disappearance of the Palace of Justice cafeteria workers, a decision later affirmed on appeal. He was the head of the 13th Brigade's B-2 Intelligence unit and among the high-ranking officials coordinating with Defendant during the retaking of the Palace of Justice.

17. In 2015, then-President of Colombia Juan Manuel Santos publicly apologized to the victims' families for the actions of the military during the retaking of the Palace of Justice.

18. Nevertheless, despite the unearthed evidence and Plaintiffs' tireless efforts, no individual has ever been held accountable for Magistrate Urán's torture and extrajudicial killing.

19. Plaintiffs, surviving family members of Magistrate Urán and his estate, commence this action against Defendant for his responsibility and role in the torture and extrajudicial killing of Magistrate Urán in connection with the retaking of the Palace of Justice in November 1985.

20. This is an action for compensatory and punitive damages for torts in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note) ("TVPA").

## JURISDICTION AND VENUE

21. This Court has jurisdiction over Plaintiffs' claims of torture and extrajudicial killing under 28 U.S.C. § 1331, as this action arises under the TVPA.

22. Defendant Luis Alfonso Plazas Vega is a Colombian citizen who resides in Weston, Broward County, Florida, where he owns property.

23. Venue is proper in the Southern District of Florida, pursuant to 28 U.S.C. § 1391(b)(1) and (c)(1).

## PARTIES

### *Defendant*

24. In November 1985, Defendant was a lieutenant colonel and the commander of the Colombian Army's 13th Brigade Cavalry School in Bogotá. General Arias Cabrales, the head of the 13th Brigade, gave Defendant command of the mission to retake the Palace of Justice.

25. In 1995, following Defendant's tenure in the Colombian military, he attempted to be stationed abroad as part of Colombia's foreign service, including as Consul General in the United States and in Germany. According to declassified U.S. government cables, both of those attempts were unsuccessful due in part to his reported involvement in human rights abuses, including the forced disappearances in the retaking of the Palace of Justice, and his role in forming and directing a paramilitary group in conjunction with Medellin Cartel leaders.

26. In 2002, Defendant was appointed to head Colombia's National Narcotics Department but resigned in 2004 following accusations in the Colombian Congress of mismanaging property confiscated from drug traffickers.

27. Starting in 2016, Defendant began to travel frequently to the United States, where he eventually purchased property and established residence.

*Decedent Carlos Horacio Urán Rojas*

28. Magistrate Carlos Horacio Urán Rojas was an Auxiliary Justice of the Council of State in Colombia, which was housed at the Palace of Justice. As of November 1985, Magistrate Urán had served as an Auxiliary Justice for more than five years.

29. At the time, Magistrate Urán had completed three master's degrees at the Sorbonne University in Paris. While serving as an Auxiliary Justice, Magistrate Urán was also pursuing his doctoral studies at the Sorbonne.

30. He was married with four daughters.

*Plaintiffs*

31. Plaintiff Helena Urán Bidegain is the daughter of Magistrate Urán. She was ten years old when her father was killed. She left Colombia with her family following her father's death. She is a German citizen, currently residing in the United States. She brings this action in her individual capacity and in her capacity as the personal representative of her late father's estate.

32. Plaintiff Xiomara Urán is the daughter of Magistrate Urán. She was one year old when her father was killed. She left Colombia with her family following her father's death. She is a United States citizen, currently residing in the United States. She brings this action in her individual capacity.

33. Plaintiff Mairée Urán Bidegain is the daughter of Magistrate Urán. She was five years old when her father was killed. She left Colombia with her family following her father's death. She is a French citizen, currently residing in Chile. She brings this action in her individual capacity.

**STATEMENT OF FACTS**

34. Except with respect to Plaintiffs' background, on information and belief, Plaintiffs allege as follows:

*The Colombian Military's Pattern of Abuses Against Suspected Guerillas and Suspected Guerilla Sympathizers*

35. Colombia has endured more than half a century of internal armed conflict. Since the 1960s, leftist armed guerrillas proliferated while right-wing paramilitaries countered with the Colombian government's initial acquiescence and assistance. Illegal armed groups from the left and the right funded their activities with drug trafficking and committed atrocities against civilian populations, each justifying their actions on ideological grounds.

5

36. While many actions taken by the Colombian military to restore public safety were legitimate, systematic human rights violations, including torture, forced disappearances, illegal surveillance, and extrajudicial killings have been part of the military's purported campaign against the guerillas. The targets of these abuses, however, were not only guerrilla members, but also civilians suspected of having any connection with the guerrillas.

37. Throughout the 1980s, Colombian state actors targeted civilians suspected of affiliating or sympathizing with guerilla groups for detention, interrogation, torture, forced disappearance and extrajudicial killing. The majority of these abuses were carried out by members of the Colombian military. Individuals accused of "subversive activities" were held in military facilities and temporary detention centers, where members of the military would subject them to interrogations and torture. Following their interrogation and torture in these military facilities, many of the detainees were forcibly disappeared or killed. The military routinely concealed their victims' remains.

38. These atrocities were carried out by members of the Colombian military with the knowledge and support of their commanders, with very few cases of effective investigations or prosecutions.

39. As documented by Colombian courts and international human rights judicial bodies and organizations, the grounds of the 13th Brigade's military complex on the outskirts of Bogotá were used by the military to torture, extrajudicially kill and forcibly disappear civilians suspected of ties to the guerillas during this period. Detainees were held in buildings across the 13th Brigade's military complex, including the Cavalry School.

40. During the retaking of the Palace of Justice, the military followed a similar pattern and transferred individuals tagged *especiales* to these same locations to be interrogated, tortured and extrajudicially killed or forcibly disappeared.

### *The Palace of Justice Siege*

41. At around 11:00 a.m. on November 6, 1985, approximately 35 armed members of the M-19 guerrilla group attacked the Palace of Justice in Bogotá, Colombia – a large four-story building that is the home of the Supreme Court and the Council of State, the nation's two highest courts. The guerrilla members entered through the basement parking lot and took over the Palace of Justice, holding the approximately 300 individuals inside hostage.

42. The Colombian government reacted swiftly. At or about 11:30 a.m. on November 6, the military began its operation to retake the Palace of Justice and free the hostages. The operation was directed and coordinated by the Colombian Army's 13th Brigade stationed on the outskirts of Bogotá, which operated under the command of General Arias Cabrales.

43. At the time, Defendant was a lieutenant colonel and the commander of the Cavalry School, a unit of the 13th Brigade specializing in armored fighting vehicles as well as more traditional horse-mounted troops. General Arias Cabrales gave Defendant command over the military's operation to retake the Palace of Justice.

44. Defendant and his troops arrived at the Plaza Bolívar. As shown in the map below, the Plaza Bolívar (figure 1) is a square surrounded by government buildings, including the Palace of Justice (figure 2 on the north side of the square), city hall (figure 3 on the western side), Congress (figure 4 on the south side), and the national cathedral (figure 5 on the eastern side). A temporary command center was set up at the *Casa del Florero* (figure 6), a small two-story building housing the Independence Museum of Colombia located a short walk across the street from the main entrance of the Palace of Justice, on the northeastern corner of the square.



Source: Forensic Architecture, Palacio de Justicia 3D model (2021), https://forensic-architecture.org/investigation/enforced-disappearance-at-the-palacio-de-justicia *(figures added)*

45. At approximately 1 p.m. on November 6, soldiers from the Cavalry School breached the Palace of Justice with armored tanks.

46. Under Defendant's command, Cavalry School soldiers and other troops swept through the Palace of Justice, clearing guerillas by force and escorting civilians from the building until a large fire that began on the fourth floor of the Palace forced a retreat later that evening.

47. The next morning, on November 7, units under Defendant's command resumed operations to clear the guerillas from the Palace of Justice and escort civilians from the building. The military took custody of each individual who exited the building.

48. The retaking of the Palace of Justice was largely completed by the late afternoon on November 7, whereupon the building remained under military control.

### The *Especiales* System

49. As part of its retaking of the Palace of Justice, the military deployed an unlawful system designed to identify, interrogate, forcibly disappear, torture and, often, extrajudicially kill any suspected guerillas or guerilla sympathizers among the hostages exiting the Palace of Justice. Following their deaths, the military then denied ever having these individuals in their custody.

50. As individuals were escorted out of the Palace of Justice, they were triaged by the military. Some individuals were tagged *especiales* immediately as they were escorted out of the Palace of Justice by the military.

51. Other rescued individuals were taken to the temporary command center at the *Casa del Florero*. Following a brief interrogation on the first floor, individuals were either released or designated as *especiales*. Those labelled *especiales* were taken to the second floor, where they were subjected to a more intense and violent interrogation.

52. The *especiales* were then ultimately transported to other military facilities, including to the Cavalry School located on the grounds of the 13th Brigade. At these military facilities, *especiales* were tortured, killed, or forcibly disappeared.

53. Contemporaneous internal military radio communications confirm that the military transferred individuals who exited the Palace of Justice to military facilities. Military and police logbooks similarly document some of these transfers, including to the Cavalry School.

54. Military units were instructed to keep the rescued hostages that could not be identified "in isolation." In a recorded military radio communication, Colonel Luis Carlos Sadovnik – the second in command of the 13th Brigade and Defendant's superior officer – ordered

Colonel Sánchez Rubiano, the head of the 13th Brigade's B-2 Intelligence unit, to search for M-19 guerillas and their sympathizers among the civilians exiting the Palace of Justice. At the end of the recorded communication, Colonel Luis Carlos Sadovnik states "Let's hope that if we leave a sleeve, they won't find the whole jacket" ("*esperamos que si está la manga no aparezca el chaleco*"). According to an expert report by the Colombian police, this phrase is a coded reference to forced disappearances.

55. The majority of those designated as *especiales* were civilians who the military assumed were guerillas or guerilla sympathizers because they could not satisfactorily confirm their identity, explain their presence at the Palace of Justice, or otherwise raised the suspicions of the military and could not affirmatively disprove an affiliation with the guerillas.

56. A fortunate few of the *especiales* were able to escape by ultimately convincing the military that they were not affiliated with the guerillas, including through the intervention of connected higher-ups who saved them from torture and execution. These individuals lived to provide first-hand accounts of the *especiales* system.

57. Among the civilians who escaped the *especiales* system were two students, Eduardo Matson Ospino and Yolanda Ernestina Santodomingo, who were visiting the Palace of Justice at the time of the siege. They were escorted out of the building by military personnel on November 6, 1985, and taken to the *Casa del Florero*, where Defendant was present at the time, and giving orders. There, they were tagged as *especiales* and moved to the building's second floor.

58. Eduardo Matson Ospino and Yolanda Ernestina Santodomingo were then transferred from the *Casa del Florero* to a military facility where they were handcuffed, blindfolded, interrogated, tortured and threatened with execution.

59. Eduardo Matson Ospino and Yolanda Ernestina Santodomingo were only released after military personnel learned that Eduardo Matson Ospino's uncle was the governor of the Department of Bolívar and that he knew the son of a prominent Colombian general.

60. Other surviving *especiales* confirm that they were similarly tagged following their exit from the Palace of Justice and then transferred to the grounds of the 13th Brigade, including its Cavalry School, where they were tortured.

61. Many of the *especiales* were never released. More than half a dozen employees of the Palace of Justice cafeteria, including the cafeteria's manager, Carlos Augusto Rodríguez Vera,

were filmed exiting the Palace of Justice alive in the custody of the military. These cafeteria workers were never seen alive again and many of their bodies were never recovered.

62. Irma Franco, the only actual M-19 guerilla reported to have been captured alive by the military during the retaking of the Palace of Justice, met a similar fate. Following her identification as an M-19 guerilla, she was tagged as an *especial* and taken to the second floor of the *Casa del Florero*, where Defendant reprimanded the soldiers guarding her for being too lenient with her and the other *especiales*. Soon after, Irma Franco was placed in the back of a military truck, driven away and never seen alive again.

63. The government of Colombia has acknowledged that state actors tortured Eduardo Matson Ospino and Yolanda Ernestina Santodomingo, and forcibly disappeared Carlos Augusto Rodríguez Vera and Irma Franco in conjunction with the retaking of the Palace of Justice.

### *The Torture and Extrajudicial Killing of Magistrate Urán*

64. Magistrate Urán was in the Palace of Justice when M-19 guerrillas took over the building on the morning of November 6, 1985. He took refuge in an office and was able to speak to his wife by telephone several times that day. In the evening, he informed his wife that there was smoke, but that he was uninjured.

65. By the morning of November 7, the military had retaken control over much of the Palace of Justice. Magistrate Urán was in a group of about 60 hostages that the M-19 held in a bathroom between the 2nd and 3rd floors of the northwest corner of the building. This bathroom became the guerrillas' last holdout.

66. The guerrillas, who were crowded in the bathroom with the hostages, exchanged fire with the military forces, running in and out of the bathroom. At some point, two grenades were thrown into the overcrowded bathroom, first through a hole punched through the wall and then through the door. The explosions killed several people and left others injured. One of the explosions left multiple shrapnel injuries all over the back of Magistrate Urán's body (torso, back, back of the legs and arms, and even the sole of one foot) and severely injured his left leg.

67. The military eventually gained control over the bathroom and the fighting ended. Hostages were escorted out of the bathroom, including Magistrate Urán, who was injured and unable to move freely without assistance due to his leg injury.

68. Video taken by news agencies reporting on the retaking of the Palace of Justice captured at least three different angles of the moment when Magistrate Urán exited the building in

the custody of the military at approximately 2:17 p.m. on November 7. The videos showed Magistrate Urán being escorted out of the Palace of Justice – injured but alive – by two members of the military who supported him as he hopped to favor his injured leg.

69. Eyewitnesses present at the Palace of Justice confirm that Magistrate Urán exited the building alive.

70. Magistrate Urán was laid on a gurney by military personnel and moved out of the area.

71. Videos from multiple news stations show personnel carrying the gurney with Magistrate Urán heading toward the *Casa del Florero*, where an ambulance was also located. Magistrate Urán was not seen alive again. According to a Ministry of Justice forensic report, Magistrate Urán's body was found later that day back inside of the Palace of Justice stripped naked and washed, with a close-range gunshot wound to the temple.

72. Starting on November 7, Magistrate Urán's family and friends looked for him in the Military Hospital, and personnel from the Ministry of Health made inquiries in all the city's clinics and hospitals. No one was able to locate him.

73. On the morning of November 8, Dr. Luz Helena Sánchez Gómez, a family friend and the Chief of Medical Services at the Ministry of Health, went to *Medicina Legal* (the Institute of Forensic Medicine), to look for Magistrate Urán. She was granted access to a room guarded by military personnel, and told that it contained the bodies of guerrillas. In that room, she found Magistrate Urán's body. As she moved closer to inspect his corpse, the military guard referred to Magistrate Urán as "this son of a whore guerrilla."

74. All indications are that the military tagged and treated Magistrate Urán as an *especial*, then tortured and killed him as a result. Despite having been escorted out of the Palace of Justice alive by the military, his name was omitted from the government list of rescued civilian hostages. Instead, his name was included, added in by hand, on a separate November 7, 1985 government list of 18 deceased individuals, which included six M-19 members. Magistrate Urán's face showed signs of ante-mortem lesions, indicating that he had been beaten before being executed. His body also showed signs of post-mortem burns in the lumbar region. According to the autopsy carried out at *Medicina Legal*, Magistrate Urán died from a close-range gunshot to his temple – the same manner of death as many of the M-19 members.

75. Magistrate Urán's family ultimately identified his body at *Medicina Legal*. The military falsely told them that he had been killed inside the Palace of Justice in crossfire with the guerillas.

### *Defendant's Role in the Retaking of the Palace of Justice and the Unlawful* Especiales *System*

76. At the time of the Palace of Justice siege, Defendant was the commander of the Cavalry School, a unit of the Colombian Army's 13th Brigade. Under the orders of General Arias Cabrales, the commander of the 13th Brigade, Defendant deployed his Cavalry School troops to retake the Palace of Justice.

77. As the commander of the operation to breach the doors of the Palace of Justice and lead the operations once the military entered the building, Defendant had authority over the military personnel involved, including troops from the Cavalry School, and coordinated with other units that also entered the Palace of Justice, including the Artillery School units.

78. Defendant had authority over the units that carried out the final sweep of the Palace of Justice on November 7, 1985 and escorted out the last remaining group of hostages, which included Magistrate Urán.

79. During the operation, Defendant publicly stated that guerillas dressed in civilian clothing were among the individuals escorted out by the military, including as part of the final sweep of the Palace of Justice.

80. Defendant principally operated near the Palace of Justice, including in the *Casa del Florero*, which served as the military's operational command center and the main screening site for hostages who exited the Palace of Justice.

81. Defendant repeatedly met with other high-ranking officers inside the *Casa del Florero*, including the commander of the 13th Brigade, General Arias Cabrales and the head of the 13th Brigade's B-2 Intelligence unit, Colonel Sánchez Rubiano, to coordinate the military response to the M-19 takeover of the Palace of Justice.

82. Defendant also coordinated the military's operation with civilian law enforcement units assisting in the retaking of the Palace of Justice, including the National Police and the Administrative Department of Security (DAS, *Departamento Adminsitrativo de Seguridad*), Colombia's civilian intelligence agency at the time.

83. Defendant issued orders and received reports in person, through his direct subordinates and via radio communication using the call sign "Azabache 6."

84. Defendant personally escorted a number of rescued hostages from the Palace of Justice to the *Casa del Florero*, where they were interrogated by the military, including by members of the 13th Brigade's B-2 Intelligence unit.

85. Defendant repeatedly inspected the second floor of the *Casa del Florero*, where a number of the *especiales* were initially held before being transferred to military facilities.

86. While on the second floor of the *Casa del Florero*, Defendant issued orders to the military personnel guarding the *especiales* and reprimanded them for being too lenient with the suspected guerillas in their custody.

87. Defendant ordered the transfer of *especiales* to military facilities, including to the Cavalry School, where *especiales* were tortured and killed or forcibly disappeared.

88. Defendant ordered that reports be sent back to him regarding the interrogation of the *especiales* at these military facilities.

### *The Military Cover-Up of the Illegal* Especiales *System and of the Circumstances of Magistrate Urán's Death*

89. Following the retaking of the Palace of Justice, the military mounted a campaign of disinformation and intimidation aimed at covering up the existence of the illegal *especiales* system and the crimes committed under that system, including the torture and killing of Magistrate Urán.

90. First, the few *especiales* who were released were told to keep quiet and threatened by the military with further harm if they spoke to anyone about the torture they suffered. For example, when Jaime Buitrago Castro was released after being labelled an *especial* and tortured, he was instructed to keep silent. Upon being returned to the *Casa Del Florero* from a military facility, members of the military removed his hood and told him, "Go, and be careful not to speak or tell what happened, and you won't have any more problems." Jaime received a phone call several days after his release. The caller threatened him and his mother, indicating that they were under surveillance.

91. Second, the military intimidated family members, along with journalists and lawyers, who sought information about *especiales* who had been killed or disappeared. Defendant personally warned individuals seeking information on those killed during the Palace of Justice siege to stop asking questions about the victims. Defendant also physically assaulted families of

13

victims peacefully protesting against the failure of the Colombian government to investigate and prosecute those responsible for the deaths or disappearances of the *especiales*.

92. Third, state actors mishandled the crime scene at the Palace of Justice despite existing protocols in place in 1985, including by moving the bodies from where they were found to the first floor of the Palace of Justice, and by hosing off the bodies and their wounds before forensic personnel could examine them and the crime scene. This hampered a proper investigation into the manner and location of the victims' deaths. The Colombian government has admitted that its agents improperly handled evidence collected at the Palace of Justice.

93. Fourth, the military actively concealed evidence that would establish the existence of the illegal *especiales* system and of the torture and extrajudicial killings, including by threatening the few *especiales* who were freed so that they would not complain of ill treatment, refusing to acknowledge that rescued hostages were in military custody upon exiting the Palace of Justice, or by claiming that missing individuals may have been among the unidentified bodies found in the fourth floor, where the worst of the fire took place.

94. With respect to Magistrate Urán, the military denied ever having him in its custody. Shortly after his death, the military misled his family by telling them that he had died inside the Palace of Justice as a result of crossfire with the guerillas.

95. Other families who could not locate the remains of their loved ones began a campaign to find their disappeared family members. Those efforts resulted in a criminal investigation of military officers regarding eleven cafeteria workers who had been disappeared during the retaking of the Palace of Justice.

96. In 2007, as this investigation slowly advanced, a court order was issued to search the premises of the 13th Brigade. When the prosecutor's office conducted an official search of the premises, Magistrate Urán's belongings, including the contents of his wallet, were found hidden in a locked vault inside the 13th Brigade. The search also uncovered military files regarding the Palace of Justice siege, including the fingerprints and identifications of Yolanda Santodomingo and Eduardo Matson, the two students tortured by military officials after being tagged *especiales*. Another recovered military document, entitled "information related to the 'S' *especial*," detailed information regarding Irma Franco, the captured M-19 member whom the Colombian government has acknowledged was forcibly disappeared by state agents in conjunction with the retaking of the Palace of Justice.

97. That same year, video records and eyewitness testimony of Magistrate Urán exiting the Palace of Justice alive emerged to lay bare the military's falsehoods.

### *Despite Plaintiffs' Efforts, the Domestic Investigation into Magistrate Urán's Death Has Not Progressed*

98. Following Magistrate Urán's death in 1985, Colombian authorities misled his family regarding the circumstances of his death.

99. In 2007, when Magistrate Urán's belongings were discovered at the 13th Brigade and video evidence emerged showing that he had exited the Palace of Justice alive, Plaintiffs pushed to have a criminal investigation into his death opened.

100. In response to Plaintiffs' demands, the Colombian Prosecutor General assigned Magistrate Urán's case to prosecutor Angela Buitrago in 2008, who opened an investigation in 2010. After prosecutor Angela Buitrago launched her investigation and sought to interview prominent military officials however, the Prosecutor General removed her from the case and reassigned it to the National Unit for Human Rights and International Humanitarian Law, where the case has stalled once more without any tangible results.

101. Given the lack of progress in Colombia, Plaintiffs filed a petition before the Inter-American Court of Human Rights. In 2014, the Inter-American Court of Human Rights found that Colombian state actors tortured and killed Magistrate Urán following his exit from the Palace of Justice, and ordered the Colombian government to investigate and prosecute those responsible. To date, no individual has been investigated or held accountable in Colombia for Magistrate Urán's killing.

102. In 2016, Defendant began to travel to the United States – the first time he had done so since the emergence of the new evidence regarding Magistrate Urán in 2007.

103. Plaintiffs first became aware of Defendant's travels to and presence in the United States in 2017.

### GENERAL ALLEGATIONS

104. Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

105. The acts described herein were inflicted under color of law and under color of official authority of the State of Colombia and were inflicted deliberately and intentionally.

106. At all relevant times described herein, Defendant was the commander of the military operation to retake the Palace of Justice.

107. Defendant conspired and acted in concert with one or more other members of the military, including fellow members of the 13th Brigade, General Arias Cabrales, Colonel Sánchez Rubiano and Colonel Luis Carlos Sadovnik, in a common plan, design, and scheme to carry out the torture and extrajudicial killing or forced disappearance of *especiales* as part of the military's operation to retake the Palace of Justice.

108. Defendant knowingly joined and actively participated in carrying out the common plan, design, and scheme of the illegal *especiales* system. In addition to being personally liable for his own actions, Defendant is jointly and severally liable for the actions of his co-conspirators, all of which were actions undertaken in furtherance of the common plan, design, and scheme.

109. The torture and extrajudicial killing of Magistrate Urán were foreseeable consequences of a common, shared intention to carry out the illegal *especiales* system.

110. Defendant is also responsible by virtue of having aided and abetted, or otherwise substantially assisted, in the authorization, implementation, and oversight of the illegal *especiales* system.

111. At all relevant times, Defendant knew and purposefully intended that his actions would aid, abet, or assist in the commission of crimes tied to the illegal *especiales* system and the cover-up thereof. Defendant is therefore jointly and severally liable for the wrongful conduct of the persons he aided and abetted.

112. As commanding officer, Defendant further had the legal authority and practical ability to exert control over his subordinates, including those who participated in the illegal *especiales* system that resulted in the torture and extrajudicial killing of Magistrate Urán.

113. In light of his role as a lieutenant colonel and the commander of the Colombian Army's 13th Brigade Cavalry School, Defendant knew, or should have known, that his subordinates committed unlawful acts as part of the *especiales* system. Defendant failed to prevent the unlawful acts committed by his subordinates and then failed to investigate or punish his subordinates' involvement in the unlawful *especiales* system, including the torture and extrajudicial killing of Magistrate Urán.

114. Defendant's acts and omissions, or those of his subordinates, as described herein, were deliberate, intentional, wanton, malicious, oppressive, and done with a willful and conscious

disregard for Plaintiffs' rights and those of the decedent Magistrate Urán. Consequently, Plaintiffs are entitled to punitive damages.

## FIRST CLAIM FOR RELIEF
*(Extrajudicial Killing of Magistrate Urán – all Plaintiffs)*

115. Plaintiffs Xiomara Urán and Mairée Urán Bidegain, in their individual capacities and Plaintiff Helena Urán Bidegain in her individual capacity and as the legal representative of the estate of Magistrate Urán, re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

116. Following his exit from the Palace of Justice on November 7, 1985, Magistrate Urán was extrajudicially killed by the military as a result of their unlawful *especiales* system.

117. Magistrate Urán's death was deliberate and carried out under color of foreign law and constitutes an extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

118. No regularly constituted court authorized the killing of Magistrate Urán, which was unlawful under Colombian law, international law, and under the laws of any foreign nation. Magistrate Urán was never charged with, convicted of, or sentenced in relation to any crime.

119. As pleaded above, Defendant conspired with, aided and abetted, and/or exercised command responsibility over the individuals who carried out the extrajudicial killing of Magistrate Urán.

120. Prior to his execution, Magistrate Urán was placed in imminent fear for his life and suffered severe emotional and physical abuse and agony. His killing inflicted severe mental pain and suffering on his family members, Plaintiffs Helena Urán Bidegain, Xiomara Urán, and Mairée Urán Bidegain.

121. As a direct and proximate result of Magistrate Urán's extrajudicial killing, Plaintiffs continue to suffer from loss of companionship, support, and services.

122. As a result of the extrajudicial killing of Magistrate Urán, Plaintiffs have suffered damages in an amount to be determined at trial.

123. In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

*(Torture of Magistrate Urán - Plaintiff Helena Urán Bidegain in her capacity as the legal representative of the estate of Magistrate Urán)*

124.   Plaintiff Helena Urán Bidegain, in her capacity as the legal representative of the estate of Magistrate Urán, re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.   On November 7, 1985, Magistrate Urán was taken into the custody of military personnel under Defendant's command and control and tagged and treated as an *especial*. Already injured, Magistrate Urán was deprived of medical care and instead brutalized by the military, including beatings to his face, prior to his extrajudicial killing.

126.   The acts described herein caused Magistrate Urán excruciating injuries and severe physical and mental pain and suffering.

127.   These acts were inflicted intentionally and deliberately for purposes that include, among others, punishing Magistrate Urán for acts that he or third persons were suspected of having committed as perceived guerillas or guerilla sympathizers, intimidating or coercing Magistrate Urán into providing information on the M-19 guerrilla group and its attack on the Palace of Justice, or discriminating against Magistrate Urán on the basis of his perceived political beliefs.

128.   These acts constitute torture in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

129.   The torture of Magistrate Urán did not arise from and was not inherent in or incidental to lawful sanctions.

130.   At the time these acts occurred, Magistrate Urán was in the custody or physical control of Defendant or Defendant's co-conspirators who were members of the Colombian military. These acts were committed under actual or apparent authority, or under color of law, of the State of Colombia.

131.   As pleaded above, Defendant conspired with, aided and abetted, and/or exercised command responsibility over the individuals who tortured Magistrate Urán in keeping with the unlawful *especiales* system.

132.   As a result of Magistrate Urán's torture, the estate of Magistrate Urán has suffered damages in an amount to be determined at trial.

133. In addition, Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive and exhibited a reckless indifference to Magistrate Urán's rights. Consequently, Defendant should be punished by an award of punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

To the extent permitted by law, Plaintiffs seek the following relief against Defendant:

(a)  compensatory damages;

(b)  punitive damages;

(c)  reasonable attorneys' fees, costs and expenses; and

(d)  such other and further relief as the court may deem just and proper.

Plaintiffs request a trial by jury for each claim for relief and all triable issues.

Dated: February 15, 2022         By:  /s/ *Betty Chang Rowe*

Betty Chang Rowe (Florida State Bar No. 0003239)
browe@wsgr.com
Leo P. Cunningham (*pro hac vice forthcoming*)
lcunningham@wsgr.com
Luke A. Liss (*pro hac vice forthcoming*)
lliss@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300

Dylan G. Savage (*pro hac vice forthcoming*)
dsavage@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000

Estefania Y. Torres Paez (*pro hac vice forthcoming*)
etorrespaez@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, 5th Floor
Washington, DC 20006

Telephone: (202) 710-9362

Claret Vargas (*pro hac vice forthcoming*)
cvargas@cja.org
Daniel McLaughlin (*pro hac vice forthcoming*)
dmclaughlin@cja.org
Carmen K. Cheung (*pro hac vice forthcoming*)
ccheung@cja.org
CENTER FOR JUSTICE & ACCOUNTABILITY
One Hallidie Plaza, Suite 750
San Francisco, CA 94102
Telephone: (415) 544-0444

*Attorneys for Plaintiffs*