**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No 22-CV-60338-RAR**

HELENA URÁN BIDEGAIN in her individual capacity and in her capacity as the legal representative of the ESTATE OF CARLOS HORACIO URÁN ROJAS,

XIOMARA URÁN, in her individual capacity,

and MAIRÉE URÁN BIDEGAIN, in her individual capacity,

*Plaintiffs*,

v.

LUIS ALFONSO PLAZAS VEGA,

*Defendant*.
_______________________________________/

**DEFENDANT LUIS ALFONSO PLAZAS VEGA'S**
**RULE 12 MOTION TO DISMISS**

Mark J. Heise
Luis E. Suarez
Patricia Melville
Anthony Perez
**Heise Suarez Melville, P.A.**
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, FL 33134
Tel: (305) 800-4476

*Attorneys for Defendant Luis Alfonso Plazas Vega*

**TABLE OF CONTENTS**


| | Page |
|---|---|
| Table of Authorities | iii |
| Introduction | 1 |
| Legal Standard | 4 |
| Argument | 8 |
| I. The Complaint should be dismissed for Plaintiffs' failure to exhaust adequate and available remedies in Colombia | 8 |
| a. Before bringing a TVPA claim, Plaintiffs were required to exhaust adequate and available remedies in Colombia | 8 |
| b. The remedies under Colombia's Victims Law were available and adequate | 9 |
| c. The remedies under the Colombian Constitution were available and adequate | 11 |
| d. Plaintiffs' failure to seek remedies under the Victims Law and Colombian Constitution requires dismissal | 12 |
| II. This Court should decline to hear this case under the doctrine of international comity | 13 |
| a. Colombia's Supreme Court was competent and used proceedings consistent with civilized jurisprudence | 14 |
| b. The judgment was not entered by fraud, and Colombia was an adequate forum | 17 |
| c. The foreign judgment was not prejudicial or violative of American public policy notions of what is decent and just | 18 |
| Conclusion | 21 |

## TABLE OF AUTHORITIES

**Cases** **Page**

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283, 1290 (11th Cir. 2010) ............................................. 13

*Bautista v. Cruise Ships Catering and Serv. Intern., N.V.*,
350 F. Supp. 2d 987 (S.D. Fla. 2003) ............................................. 12

*Belize Telecom, Ltd. v. Gov't of Belize*,
528 F.3d 1298 (11th Cir. 2008) ............................................. 18

*Bryant v. Rich*,
530 F.3d 1368 (11th Cir. 2008) ............................................. 4, 5, 7, 8

Corte Suprema de Justicia Sala. Pen.
15 Diciembre 2015, M.P.: L. Salazar Otero, Radicación 38957, Gaceta Judicial [G.J.] ............................................. 2, 16

*Chowdhury v. Worldtel Bangl. Holding, Ltd.*,
746 F.3d 42 (2d Cir.2014) ............................................. 19

*Corrie v. Caterpillar, Inc.*,
403 F. Supp. 2d 1019 (W.D. Wash. 2005) ............................................. 13

*Diaz v. Aerovias Nacionales de Colombia, S.A.*,
1991 WL 35855 (S.D.N.Y. Mar. 12, 1991) ............................................. 12

*Escarria-Montano v. United States*,
797 F. Supp. 2d 21, 25 (D.D.C. 2011) ............................................. 13

*Friedman v. Bayer Corp.*, Case No. 99-CV-3675,
1999 WL 33457825 (E.D.N.Y. Dec. 15, 1999) ............................................. 13

*Harbury v. Hayden*,
444 F. Supp. 2d 19, 41 (D.D.C. 2006) ............................................. 13

*Hilao v. Est. of Marcos*,
103 F.3d 767 (9th Cir. 1996) ............................................. 5

*In re Chiquita Brands Int'l Alien Tort Shareholder Deriv. Litig.*,
190 F. Supp. 3d 1100 (S.D. Fla. 2016) ............................................. 6, 7

*In re W. Caribbean Crew Members*,
632 F. Supp. 2d 1193, 1201 (S.D. Fla. 2009) ............................................. 12

*Int'l Ass'n of Entrepreneurs of Am. v. Angoff*,
58 F.3d 1266 (8th Cir.1995) ………………………………………………... 5

*Iragorri v. Int'l Elevator, Inc.*,
203 F.3d 8 (1st Cir. 2000) ………………………………………………... 12

*Jean v. Dorelien*,
431 F.3d 776 (11th Cir. 2005) ……………………………………………. 6, 7, 13

*Jones v. Auto Ins. Co.*,
917 F.2d 1528 (11th Cir. 1990) …………………………………………….. 8

*Mezerhane v. Republica Bolivariana de Venezuela*,
785 F.3d 545 (11th Cir. 2015) ……………………..……………………........... 4

*Mujica v. AirScan Inc*,
771 F.3d 580 (9th Cir. 2014) ……………………………………………. 11, 13, 14, 18, 19, 20

*Paolicelli v. Ford Motor Co.*,
289 F. App'x 387 (11th Cir. 2008) ………………………………………….. 12, 18

*Posner v. Essex*,
178 F.3d 1209, 1222 (11th Cir. 1999) ……………………………………… 16

*Quiller v. Barclays Am./Credit, Inc.*,
727 F.2d 1067 (11th Cir. 1984) …………………………………………….. 7

*Republic of Colombia v. Diageo N. Am. Inc.*,
531 F. Supp. 2d 365 (E.D.N.Y. 2007) ……………………………………… 12

*Rojas Mamani v. Sanchez Berzain*,
636 F. Supp. 2d 1326 (S.D. Fla. 2009) ……………...………………………... 2, 4, 5, 6, 7, 8, 9, 12, 13, 16

*Sequihua v. Texaco, Inc.*,
847 F.Supp. 61 (S.D.Tex.1994) ……………………………………………….. 19

*Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*,
421 F. Supp. 2d 87 (D.D.C. 2006) …………………………………………….. 12

*Tillery v. U.S. Dep't of Homeland Sec.*,
402 F. App'x 421 (11th Cir. 2010) ……………………………………………. 4

*Torres v. S. Peru Copper Corp.*,
965 F.Supp. 899 (S.D.Tex.1996) ……………………………………………… 19

*Tr. Int'l Corp. v. Nagy*, Case No. 15-80253-CIV,
2017 WL 5248425 (S.D. Fla. Mar. 28, 2017) …………………………………. 16

*Trustmark Ins. Co. v. ESLU, Inc.*,
299 F.3d 1265 (11th Cir. 2002) ……………………………………………….. 8

*Underhill v. Hernandez*,
168 U.S. 250 (1897) ……..……………………………………...………… 4

*Ungaro-Benages v. Dresdner Bank AG*,
379 F.3d 1227, 1237 (11th Cir. 2004) ……………………………………… 13, 14

*United States v. Kaley*,
579 F.3d 1246 (11th Cir. 2009) ……………………………………………. 6

**Foreign Law**

Victims Law (Law 1448/2011) ....………………………………………………. 9, 10

**Statutes**

28 U.S.C § 1350 ………………………………………………………………. 2

**Rules**

Fed.R.Civ.P. 12 ….………………………………………………………………. 5

**Articles**

*Colombia extends Victims' Law until 2031*, JUSTICE FOR COLOMBIA, NOV. 19, 2021 …. 17

*El caso Plazas Vega 28 años después del Holocausto*, *ÁMBITO JURÍDICO*, Nov. 5, 2013 15

*El coronel (r) Alfonso Plazas Vega, acusado de desaparición forzada, fue recluido en el Cantón Norte*, *SEMANA*, Jul. 15, 2007 ……………………………………………….. 15

Joseph B. Treaster, *Death Toll at 100 After Rebel Siege in Colombian City*, THE NEW YORK TIMES, Nov. 9, 1985 ……………………………………………………...... 1

*La de Plazas Vega por los desaparecidos del Palacio, una condena que encendió 25 años de polémica*, EL TIEMPO, Jun. 12, 2010 ………………………………………. 15

Nelson Camilo Sanchez & Adriana Rudling, Reparations in Colombia: Where To? Maping the Colombian Landscape of Reparations for Victims of the International Armed Conflict (Luke Moffet & Peter Dixon eds., 2019) ………………………… 9

*Se reabre caso del Palacio de Justicia*, EL TIEMPO, Aug. 23, 2006 ...………….......... 1

*Sexto Informe de Seguimiento al Congreso de la República 2018-2019*, Comisión de Seguimiento y Monitoreo al Cumplimiento de la Ley 1448 de 2011, August 16, 2019 3

The Inter-American Institute for Philosophy, Government, and Social Thought …….. 20

## Introduction

On November 6, 1985, armed M-19 guerillas, a Colombian terrorist group ("M-19"), stormed Colombia's Supreme Court complex, also known as the Palace of Justice, and tragically murdered dozens of Colombian lawyers and judges while taking others hostage. One of the men tasked with neutralizing the active terrorist scene was the Defendant, Luis Alfonso Plazas Vega, at the time a lieutenant colonel in the Colombian Army and commander of the Cavalry School in the Army's 13th Brigade. Following direct orders of the Colombian government and the Supreme Court, the Defendant ordered the 13th Brigade's Cavalry School to retake the Palace of Justice and to rescue hostages. The Cavalry School charged bravely into the M-19-occupied building, battled the terrorists, retook the Palace of Justice, and rescued nearly 300 hostages. On that fateful day, 94 people lost their lives. The count might have been higher without the military's swift and potent reaction. This is the sort of calculation no person wants to make, but it's the sort that rested on Plazas Vega's shoulders that day.[1]

As was the case for most Colombians, that day changed Plazas Vega's life forever. In addition to enduring the trauma from fighting against armed terrorists, he served nearly eight years for crimes he never committed. The immediate investigation after the M-19 attack on the Palace of Justice was completed in 1986 and concluded that M-19 members were responsible for all victims of the assault, including judges and civilians. But, beginning in 2006, the Colombian government reopened the case and investigated, charged, and convicted certain members of the military for crimes arising from the 1985 M-19 attack.[2] As a result, in 2008, Plazas Vega, by then a retired Colonel, was charged with the

---

[1] The number of people killed that day approached 100 with hostages totaling around 300, including the entirety of the Supreme Court of Justice. *See* Joseph B. Treaster, *Death Toll at 100 After Rebel Siege in Colombian City*, THE NEW YORK TIMES, Nov. 9, 1985, https://www.nytimes.com/1985/11/09/world/death-toll-at-100-after-rebel-siege-in-colombian-city.html

[2] *Se reabre caso del Palacio de Justicia*, EL TIEMPO, Aug. 23, 2006, https://www.eltiempo.com/archivo/documento/MAM-2146929.

crime of forced disappearance and imprisoned until 2015, when Colombia's Supreme Court overturned his conviction. Finding the evidence supporting his conviction to be unreliable, the Supreme Court ordered that it was "not possible to declare him criminally responsible."[3] Yet now, at the advance age of 77, instead of spending time with his grandchildren, he is forced to spend his time and limited funds defending this lawsuit.

By entertaining this lawsuit, this United States court would be adjudicating a Colombian colonel's culpability in a conflict between Colombian terrorists and the Colombian people that occurred in Colombia nearly 40 years ago. When President George H.W. Bush signed the Torture Victim Protection Act ("TVPA"), 28 U.S.C § 1350, into law in 1992, he recognized the danger that federal courts could "become embroiled in difficult and sensitive disputes in other countries, and possibly ill-founded or politically motivated suits, which have nothing to do with the United States and which offer little prospect of successful recovery." In his signing statement, President Bush expressed hope that courts in the United States would "avoid these dangers by sound construction of the [TVPA] and the wise application of relevant legal procedures and principles."[4] President Bush's concern, echoed by Congress, explains why the TVPA has an exhaustion of remedies requirement. Specifically, Section 2(b) mandates that a "court ***shall decline*** to hear a claim … if it appears that the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 Note, § 2(b) (emphasis added).

---

[3] Corte Suprema de Justicia [C.S.J.] [Supreme Court of Justice], Sala. Pen. 15 Diciembre 2015, M.P.: L. Salazar Otero, Radicación 38957, Gaceta Judicial [G.J.] (No. 446, p. 355), attached as **Exhibit "A."**

[4] *Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1332 (S.D. Fla. 2009) (citing President George H.W. Bush's Signing Statement as to the TVPA, 29 Weekly Compilation of Presidential Documents 465, 1992 U.S.C.C.A.N. 91 (March 16, 1992)).

Here, the dangers that Congress and the President feared are present and pronounced. Plaintiffs appear to have failed to exhaust their remedies in Colombia. Indeed, they have not even bothered to initiate any action under any remedy afforded to them under Colombian law. The Republic of Colombia has made every effort to atone for any military overreach or miscalculation during the M-19 attack, including by passing a specific law—the Victims Law—through which victims can recover damages amongst other relief.[5] The Victims Law applies to any person (and their family) victimized by the Colombian government since, purposefully, January 1, 1985.[6] Tens of thousands of individuals have applied for and received reparations under the law,[7] but not Plaintiffs. In addition, Article 90 of the Colombian Constitution allows for civil actions for damages caused by a government action. Plaintiffs appear to have failed to avail themselves under Article 90, too. This failure to exhaust clearly available remedies in Colombia alone merits dismissal.

Besides failing to satisfy the TVPA's exacting, threshold exhaustion requirement, the doctrine of international comity further compels the conclusion that this Court should abstain from hearing this Colombian-based dispute. Colombia's highest court vacated Plazas Vega's wrongful conviction after his eight-year incarceration arising from of the M-19 attack. Moreover, Colombia's civil reparations scheme through, *inter alia*, the Victims Law and its civil justice system, has provided Plaintiffs the opportunity for years to bring claims in Colombia. Again, Plaintiffs appear to have never availed themselves of these rights and opportunities under Colombian law.

---

[5] A copy of the Victims Law (Law 1448/2011) is attached as **Exhibit "B."**

[6] *See* Exhibit B, Law 1448/2011, Art. 3

[7] *Sexto Informe de Seguimiento al Congreso de la República 2018-2019*, Comisión de Seguimiento y Monitoreo al Cumplimiento de la Ley 1448 de 2011, August 16, 2019, https://apps.procuraduria.gov.co/gp/gp/anexos/sexto_informe_implementacion_victimas_restitucion_congreso_2018_2019.pdf, p. 32

Colombia's judiciary certainly appears better positioned to hear the dispute where evidence is stored, where witnesses reside, and where the actions by the Colombian military against the Colombian M-19 terrorists took place. Although the U.S. Supreme Court has cautioned that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory," this is precisely what Plaintiffs invite this Court to do. *Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545, 552 (11th Cir. 2015) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)). We respectfully submit that this Court should reject their invitation.

**Legal Standard**

This Court must "decline to hear a [TVPA] claim" if the plaintiff has not "exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." *See* 28 U.S.C. 1350, §2(b). Although the TVPA's "Exhaustion of Remedies" requirement might not define or limit the subject-matter jurisdiction of this Court, it nonetheless functions, where applicable, to prevent this Court from reaching the merits of a TVPA claim. *See Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1328 (S.D. Fla. 2009).

When a statutory framework prevents a court from reaching the merits absent exhaustion, the appropriate vehicle is ordinarily a motion to dismiss. *See Bryant v. Rich*, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (addressing the Prison Litigation Reform Act (PLRA)'s non-jurisdictional, administrative exhaustion requirement)*; Rojas Mamani*, 636 F.Supp.2d at 1329 (citing *Bryant* and dismissing TVPA action); *see also Tillery v. U.S. Dep't of Homeland Sec*., 402 F. App'x 421, 424 (11th Cir. 2010) (rejecting the argument that *Bryant* should not apply outside PLRA context, because *Bryant* relied upon "general principles."). This is so regardless of whether Federal Rule of Civil Procedure 12's sub-provisions expressly provide for failure-to-exhaust dismissal. *See Bryant*, 530 F.3d at 1374–75 ("That motions to dismiss for failure to exhaust are not expressly mentioned in Rule

12(b) is not unusual or problematic."); *Int'l Ass'n of Entrepreneurs of Am. v. Angoff*, 58 F.3d 1266, 1271 (8th Cir.1995) ("While pre-answer motions are ostensibly enumerated in Fed.R.Civ.P. 12(b), district courts have the discretion to recognize additional pre-answer motions…").

This Court ought to analyze a pre-answer, failure-to-exhaust motion under the most analogous Rule 12(b) provision; here Rule 12(b)(1).[8] *Cf. Bryant*, 530 F.3d at 1376 (explaining that when a court treats a motion as having been brought under Rule 12(b), it is subject to the rules and practices applicable to the most analogous Rule 12(b) motion). *See Rojas Mamani*, 636 F.Supp.2d at 1329 (citing *Bryant* and analyzing the dismissal of a TVPA action under Rule 12(b)(1)). What is more, where, as here, "exhaustion—like jurisdiction, venue, and service of process—is treated as a matter in abatement and not an adjudication on the merits," this Court may "consider facts outside of the pleadings and to resolve factual disputes…" *Cf. Bryant*, 530 F.3d at 1376; *see also Hilao v. Est. of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) (holding the TVPA's language "demonstrates that…the issue of exhaustion is one for the court, not for the jury."). This Court is therefore not limited to the four corners of Plaintiffs' complaint and may review and consider evidence submitted by the parties. *See Rojas Mamani*, 636 F. Supp. 2d at 1332. "If the evidence conflicts, the court may 'act[ ] as a fact finder in resolving [a] factual dispute' concerning exhaustion of remedies." *Id. quoting Bryant*, 530 F.3d at 1373–74.

Against this backdrop, it is important to harmonize how courts have viewed dismissal under Rule 12(b)(1) given that exhaustion of remedies has been treated as an affirmative defense on which

[8] We recognize, as we detail throughout, that several decisions in this Circuit have held the TVPA's exhaustion requirement to be non-jurisdictional, and in many instances have referred to it as an affirmative defense. But preventing a defendant from moving to dismiss based on the TVPA's exhaustion requirement would place form over substance and completely ignore the reasoning in *Rojas Mamani*, as guided by *Bryant*.

the defendant bears the burden of proof. *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005). In *Jean*, the trial court granted a 12(b) motion,[9] stating that the plaintiff had failed to exhaust administrative remedies based on the defendant's affidavit showing that the plaintiff had obtained a judgment in Haiti against the defendant. *Id.* The Eleventh Circuit Court of Appeals understandably reversed because the trial court did not consider the allegations in the complaint that the judgment was ineffective and currently unenforceable in Haiti, further reasoning that the defendant "had not in any way met the requisite burden of proof to support an affirmative defense of nonexhaustion of remedies…." *Id.* at 783. But *Jean* did not mandate that the failure to exhaust administrative remedies could not be considered in a motion to dismiss brought under Rule 12(b).[10] Rather, the court conducted its own *de novo* review and concluded that the defendant had not met his burden of proof demonstrating the plaintiff's failure to exhaust administrative remedies. *Id*.

Three years later, this Court addressed the issue in a case nearly identical to the present action. In *Rojas Mamani*, Judge Jordan set forth the law as laid down by the *Jean* court, weighed the competing affidavits, and concluded that dismissal without prejudice under Rule 12(b)(1) was entirely proper so that plaintiffs there could pursue their administrative remedies in Bolivia. *Rojas Mamani*, 636 F. Supp. 2d at 1333. Conversely, in the sprawling and long-running case of *In re Chiquita Brands Int'l Alien Tort Shareholder Deriv. Litig*., the Court was faced with a Rule 12(b)(1) motion and, relying upon *Jean*, simply decreed that, as an affirmative defense, it was not going to consider whether the claims should be dismissed pursuant to the TVPA's clear "shall decline" language. 190 F. Supp.

---

[9] The opinion does not identify whether the 12(b) motion was filed under section (1) or section (6). Given that the Court was considering an affidavit outside the four corners of the allegations in the complaint, we assume it was under section (1).

[10] "What matters in discerning whether a rule of law expounded by a court is in fact holding is whether it was necessary to the result reached, or, in the alternative, could be discarded without impairing the foundations of the holding." *United States v. Kaley*, 579 F.3d 1246, 1253 (11th Cir. 2009).

3d 1100, 1115 (S.D. Fla. 2016). Of course, as noted earlier, the *Jean* court itself undertook such an analysis and concluded, on balance, that the exhaustion requirement had been satisfied based on the futility of proceeding in Haiti against that defendant. Notably, *In re Chiquita* made no mention of *Bryant* nor the *Rojas Mamani* decision's thorough analysis of the evidence in that case resulting in a dismissal under Rule 12(b)(1). In any event, this Court is bound by *Jean* and *Bryant*—not *In re Chiquita*.

Here, Plaintiffs have carefully crafted their complaint—as is their right—to avoid any mention of the substantial laws that the Republic of Colombia has passed to address what happened during M-19's 1985 attack. That careful crafting, however, cannot be the basis for avoiding a timely adjudication under Rule 12(b) on whether Plaintiffs ever availed themselves of the substantial remedies afforded them for years in Colombia. No discovery is needed on this issue. Plazas Vega has put forth a detailed explanation of those laws and Plaintiffs surely know whether they ever filed suit under the Victims Law or Article 90 of the Colombian constitution. If they did not pursue these available remedies, which appears to be the case as detailed in the Declaration of Colombian lawyer Carlos Alarcon (filed contemporaneously with this motion and attached as **Exhibit "C"),** then this Court must "decline to hear" this case and end this inquiry before Mr. Plazas Vega is forced to pay untold sums (that he does not have) to defend himself in an action that should be dismissed at the outset.[11]

[11] Alternatively, Defendant moves for dismissal pursuant to Rule 12(b)(6). Affirmative defenses can serve as a basis under Rule 12(b)(6) where the facts comprising the affirmative defense are admitted on the face of a complaint or are not controverted. *See, e.g., Quiller v. Barclays Am./Credit, Inc*., 727 F.2d 1067 (11th Cir. 1984); *see also In re Chiquita*, 190 F. Supp. 3d at 1114. Here, Plaintiff's complaint mentions only a "lack of progress" in Colombia and makes no mention of the available and apparently unutilized remedies detailed below. *See* Dkt. 1 at 15. Moreover, if this Court harbors continued concerns about the appropriate procedural vehicle in light of *Jean*, this Court can convert this motion into a motion for summary judgment. *See* Fed. R. Civil P. 12(d) When such a conversion occurs, a court must give the parties a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The motion is then decided under Rule

## Argument

### I. The Complaint should be dismissed for Plaintiffs' failure to exhaust adequate and available remedies in Colombia.

Before bringing a TVPA claim, Plaintiffs were required to exhaust adequate and available remedies in Colombia. Plaintiffs could have, but failed to seek remedies under Colombia's Victims Law (Law 1448/2011) that was specifically enacted to compensate victims of military conflict, or raise a claim against the government pursuant to Article 90 of the Colombian Constitution. Given that courts, including the Eleventh Circuit Court of Appeals, have consistently recognized Colombia's courts as an adequate forum, the complaint must be dismissed until Plaintiffs exhaust their remedies.

#### a. Before bringing a TVPA claim, Plaintiffs were required to exhaust adequate and available remedies in Colombia

The TVPA's "Exhaustion of Remedies" requirement states that this Court "***shall*** decline to hear a claim…if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 note, § 2(b) (emphasis added). According to the House of Representatives Report to the TVPA, "[t]his requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries." H.R. REP. 102-367, 5, 1992 U.S.C.C.A.N. 84, 87-88. The conduct giving rise to this claim, of course, occurred in Colombia.

56. *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002) (citing *Jones v. Auto Ins. Co.*, 917 F.2d 1528, 1532 (11th Cir. 1990)). As noted above, however, it is not necessary as a motion to dismiss is the appropriate vehicle to resolve this matter. *Cf. Bryant*,530 F.3d at 1374–75; *Rojas Mamani*, 636 F. Supp. 2d at 1333

As referenced above, this Court has dismissed a strikingly similar TVPA lawsuit based on the plaintiffs' failure to exhaust remedies in their home country. In *Rojas Mamani*, relatives of victims killed in the Bolivian "Gas War" sued the country's former President and Minister of Defense. 636 F. Supp. 2d at 1329. The defendants moved to dismiss and submitted evidence that the plaintiffs had failed to exhaust remedies[12]—specifically, they failed to seek remedies under laws that the Bolivian government specifically enacted in 2003 and 2008 to redress the horrors of the Gas War. *Id* at 1328.[13] Because the plaintiffs sought relief under one law, but not the other, the court dismissed the TVPA claim for failure to exhaust administrative remedies. *Id* at 1332.

**b. The remedies under Colombia's Victims Law were available and adequate.**

Colombia has passed specific laws, like those in Bolivia, through which victims of military conflict, such as the 1985 M-19 attack, can seek reparations. Most notably, Colombia's Victims Law (Law 1448/2011), offers a robust reparations package that includes monetary compensation, rehabilitation, and guarantees of non-repetition.[14] The law's stated purpose is:

---

[12] Judge Jordan received evidence on the motion to dismiss because the motion was one for lack of subject matter jurisdiction under 12(b)(1).

[13] The 2003 law provided for a payment of the equivalent of roughly $7,000 USD per victim, and the 2008 law, known as Law No. 3955, offered the equivalent of roughly $20,000 per victim as well as academic assistance and public acknowledgment of the victims. *Id* at 1330.

[14] Law 1448/2011 seeks to deliver reparations with a distributive justice mind-set that aims to attack the causes of the conflict. The tangible benefits made available to victims through this legislation aim to have a sustained positive effect that reduces, if not altogether eliminate, the socio-economic exclusion of victims, transforming their everyday lives. *See* NELSON CAMILO SANCHEZ & ADRIANA RUDLING, REPARATIONS IN COLOMBIA: WHERE TO? MAPPING THE COLOMBIAN LANDSCAPE OF REPARATIONS FOR VICTIMS OF THE INTERNATIONAL ARMED CONFLICT (Luke Moffet & Peter Dixon eds., 2019), (continued…).
https://reparations.qub.ac.uk/assets/uploads/ColombiaReparationsPolicyReportFORAPPROVAL-SP-HR-NoCrops.pdf , attached as **Exhibit "D"** [hereinafter Reparations Report], p. 33.

The Law also establishes a program that helps victims invest their compensation to build their livelihood, in line with their expectation, personal needs, and local realities. Within the different kinds of investment open to victims, there are redeemable bonuses or access to technical or professional training, the possibility of

> to establish a set of judicial, administrative, social and economic measures, individual and collective, for the benefit of the victims of violations contemplated [under] this law, within a framework of transitional justice, which makes it possible to make the enjoyment of their rights to truth, justice, and reparation with guarantee of non-repetition effectively real, so that their status as victims is recognized and dignified through the materialization of their constitutional rights."

*See* L. 1448/2011, Art. 1.

Plaintiffs surely qualify as "victim[s]" under the Law, which is defined as a person who has suffered harm (i) caused by a grave violation of human rights or grave infraction of international humanitarian law, (ii) committed 'in connection to the internal armed conflict,' and (iii) which occurred on or after January 1, 1985. *See* L. 1448/2011, Art. 3. Critically, the term "victim" includes close family members of those extra-judicially executed or forcefully disappeared. *Id*.

The Victims Law has been successful. Seven years after its approval, the Colombian government compensated 33% of forced-disappearance victims and 30.5% of homicide victims.[15] The Victims' Unit[16] reports that, between 2009 and 2016, the government granted a total of 615,560 awards, totaling the equivalent of approximately $4.6 billion. *Id* at p. 51. These awards benefited 580,415 victims, 32,557 of whom received two or more compensation awards. *Id*. Of all known compensation monies, 87% were granted to forced-displacement victims and immediate family members of homicide victims. *Id.*

---

creating or strengthening of productive enterprises or assets, acquiring new or used housing and improving these, as well as a provision for rural land acquisition. *Id* at 40.

[15] *See* Exhibit D, Reparations Report, p. 51.

[16] The Victims' Unit (formally the Victims' Comprehensive Assistance and Reparations Unit) was created in 2012 to implement the Victims Law and compensate the Colombians who have been affected by the conflict since 1985.

For whatever reason, to Plazas Vega's knowledge, Plaintiffs are not part of the thousands of Colombians who have sought remedies under this law. Plaintiffs certainly did not allege so. *See* Dkt. 1.

**c. The remedies under the Colombian Constitution were available and adequate.**

Plaintiffs also could have sought damages from the Colombian government pursuant to the Colombian Constitution. Article 90, reproduced below, establishes administrative liability when damage is caused by a government entity to a person who is not obligated to bear it under the law.

> The State shall be liable for unlawful damages caused by public authorities' acts or omissions. In that event that the State is ordered to pay compensation for damages caused by wrongful or gravely negligent acts of one of its agents, the State in turn shall demand restitution from the agent.

*See* Colombian Constitution, Article 90, attached as **Exhibit E**. The Declaration attached as Exhibit C further explains this particular remedy.

Damages against the Colombian government can be quite lucrative. For example, the plaintiffs in *Mujica v. AirScan Inc.* received more than $700,000 from the government in an action similar to this one. 771 F.3d 580, 586 (9th Cir. 2014). They had filed a complaint in Colombia against the Republic of Colombia, the Colombian Ministry of Defense, the Colombian Army, and the Colombian Air Force for damages arising from the bombing of a Colombian village by members of the Colombian Air Force. *Id*. In December 2007, a Colombian appellate court approved a settlement between plaintiffs and the Colombian government, holding that "[t]he liability of the defendant can be found, because the incident that gave rise to the settlement has been proven." *Id.* In April 2009, the Director of Legal Affairs of the National Defense Ministry directed the payment of 1,393,649,934.73 Colombian pesos—roughly $737,000—to the victims. *Id.*

Colombia is unquestionably an adequate forum, as the Eleventh Circuit has already held.. *See Paolicelli v. Ford Motor Co.*, 289 F. App'x 387, 391 (11th Cir. 2008).[17] Other Circuits agree. For example, the First Circuit held Colombia to be an adequative alternative forum for an action in dismissing a wrongful death action for forum *non conveniens*, reasoning that, "[a]t worst, a plaintiff forced to litigate a wrongful death action in Colombia rather than in an American jurisdiction faces a downgrade in remedy, *i.e.*, an institutional inhospitability to generous awards for non-economic losses. This circumstance, in and of itself, does not impugn the adequacy of the proposed alternative forum." *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 14 (1st Cir. 2000).

For whatever reason, Plaintiffs also failed to seek this type of remedy in Colombia. They certainly do not allege having made any efforts to seek reparations in Colombia. *See* Dkt. 1.

**d. Plaintiffs' failure to seek remedies under the Victims Law and Colombian Constitution requires dismissal.**

Courts routinely dismiss TVPA claims where plaintiffs fail to satisfy its exhaustion requirement. *See Rojas Mamani*, 636 F. Supp. 2d at 1331-32; *Escarria-Montano v. United States*, 797 F. Supp. 2d 21, 25 (D.D.C. 2011) (granting motion to dismiss TVPA claim for failure to exhaust

[17] *See also Iragorri*, 203 F.3d 8, 14 (1st Cir. 2000) (affirming the adequacy of a Colombian forum where "Colombian courts entertain wrongful death actions . . . grant both pecuniary and moral damages in such suits . . . and [the defendant] [i]s amenable to service of process"); *In re W. Caribbean Crew Members*, 632 F. Supp. 2d 1193, 1201 (S.D. Fla. 2009) (concluding that "Colombia [was] an available and adequate forum in which Plaintiffs [could] pursue their claims"); *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 405 (E.D.N.Y. 2007) ("As a preliminary matter, the court notes that, where Colombian courts have subject-matter jurisdiction over a matter and personal jurisdiction over the parties to a dispute, the Colombian courts have the procedures required to constitute an adequate alternative forum."); *Termorio S.A. E.S.P. v. Electrificadora Del Atlantico S.A. E.S.P.*, 421 F. Supp. 2d 87, 103 (D.D.C. 2006) (finding Colombian courts to be adequate fora); *Bautista v. Cruise Ships Catering and Serv. Intern., N.V.*, 350 F. Supp. 2d 987, 991 (S.D. Fla. 2003) (holding that Colombian courts would provide a remedy and that "[t]he Court does not conclude that Colombian courts are incapable of providing their citizens with justice."); *Diaz v. Aerovias Nacionales de Colombia, S.A.*, 1991 WL 35855, at *1 (S.D.N.Y. Mar. 12, 1991) (rejecting arguments that "civil unrest" made Colombia an inadequate forum), *aff'd*, 948 F.2d 1276 (2d Cir. 1991) (table decision).

remedies in Colombia); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 41 (D.D.C. 2006) (granting motion to dismiss TVPA claim partly for failure to exhaust remedies in Guatemala), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005) (granting motion to dismiss TVPA claim for failure to exhaust remedies in Israel), aff d, 503 F.3d 974 (9th Cir. 2007); *Friedman v. Bayer Corp.*, No. 99-CV-3675, 1999 WL 33457825 (E.D.N.Y. Dec. 15, 1999) (granting motion to dismiss TVPA claim partly for failure to exhaust remedies in Germany).[18] Like Judge Jordan did in *Rojas Mamani*, this Court should dismiss this action for failure to exhaust remedies in Colombia. Despite having available and adequate remedies in Colombia, Plaintiffs went straight to filing suit in the United States, against the express terms and intent of the TVPA.

**II. This Court should decline to hear this case under the doctrine of international comity.**

The rationale behind international comity is that, as a courtesy, judicial decisions made in other countries should be followed by U.S. courts. *See Mujica*, 771 F. 3d at 598. Comity "is not a rule expressly derived from international law, the constitution, federal statutes, or equity," but rather a courtesy that takes from all these sources to determine what should be afforded to the decisions of other nations. *Id.* It is an abstention doctrine: a federal court has jurisdiction but defers to the judgment of an alternative forum. *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004).

---

[18] Because Plaintiffs have not exhausted their claims in Colombia, their TVPA claims must be dismissed unless they can show that the Colombian "remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Jean*, 431 F.3d at 782 (quoting S. Rep. No. 102-249, at 9 (1991)). But they plead no facts to support or explain why it would be futile, unobtainable, ineffective, or inadequate to exhaust available remedies in Colombia. Their allegations are thus insufficient to excuse their failure to exhaust. *See, e.g.*, *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (allegations that merely "restat[e]" a "legal conclusion" are insufficient as a matter of law). The Court should dismiss Plaintiffs' TVPA claims for failure to exhaust remedies in Colombia.

When applying international comity retrospectively (*i.e.*, to a previous foreign judicial decree, like the Colombian Supreme Court's order vacating Plazas Vega's conviction[19]), the Eleventh Circuit has listed three principal factors to consider:

(1) whether the foreign court was competent and used "proceedings consistent with civilized jurisprudence,"

(2) whether the judgment was rendered by fraud, and

(3) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.

Courts also consider whether there is a prospect of conflicting judgments. *Ungaro-Benages*, 379 F.3d at 1238.

a. **Colombia's Supreme Court was competent and used proceedings consistent with civilized jurisprudence**

Applying the Eleventh Circuit's factors, the Ninth Circuit in *Mujica* abstained from hearing a similar claim to this one. There, Colombian citizens brought claims in California federal court arising from a 1998 Colombian Air Force bombing of a Colombian village that killed their family members. *See* 771 F. 3d at 598. In dismissing the claim, the Court highlighted that the bombing had been redressed in Colombia both criminally, *i.e.*, by convicting three Air Force officers for manslaughter, and civilly, *i.e.*, through a civil lawsuit. *Id.* As explained earlier, the victims sought and obtained more than $700,000 for wrongful death against the Republic of Colombia, the Colombian Ministry of Defense, the Colombian Army, and the Colombian Air Force. *Id.* Highlighting this criminal and civil retribution, the court declined to hear the case, and reasoned:

> In sum, because of the strength of the U.S. government's interest in respecting Colombia's judicial process, the weakness of California's interest in this case, the strength of

[19] The doctrine of international comity can be applied retrospectively or prospectively. When applied retrospectively, domestic courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings. *Id.*

> Colombia's interests in serving as an exclusive forum, and the adequacy of the Colombian courts as an alternative forum, we conclude that all of the claims before us are **nonjusticiable** under the doctrine of international comity.
>
> The crimes Plaintiffs allege are abominable, but the facts of this case nonetheless favor applying adjudicatory comity…The United States has articulated a **strong interest** in respecting the judicial process of Colombia and furthering the development of the rule of law there. The Colombian courts have shown themselves **willing to vindicate** Plaintiffs' legitimate claims against that country's government for its military's acts, and the **government has proven itself both willing and able to hold the individuals responsible for the bombing** to account, as the Galvis Gelves and Romero Pradilla litigation show. Thus, our forbearance in this circumstance is "consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement."

*Id* (emphases added). This case deals with the same country, Colombia, which has redressed the 1985 M-19 attack both civilly and criminally, just as it did with the 1998 bombing. If Colombia was willing and able to redress the 1998 bombing, it was certainly willing and able to redress the 1985 M-19 attack, as evidenced by the criminal prosecutions and Victims Law.

Colombia investigated, charged, and sentenced those responsible for the tragedy while ultimately absolving Plazas Vega. On February 11, 2008, he was charged as a co-perpetrator of crimes of forced disappearances for 11 people.[20] He was convicted of these crimes on June 9, 2010, and sentenced to 30 years.[21] Two years later, on January 30, 2012, the superior court of Bogotá overturned Plazas Vega's conviction with respect to nine of the 11 disappeared people.[22]

---

[20] *El coronel (r) Alfonso Plazas Vega, acusado de desaparición forzada, fue recluido en el Cantón Norte*, SEMANA, Jul. 15, 2007, https://www.semana.com/on-line/articulo/el-coronel-r-alfonso-plazas-vega-acusado-desaparicion-forzada-recluido-canton-norte/87104-3/.

[21] *La de Plazas Vega por los desaparecidos del Palacio, una condena que encendió 25 años de polémica*, EL TIEMPO, Jun. 12, 2010, https://www.eltiempo.com/archivo/documento/CMS-7751980.

[22] *El caso Plazas Vega 28 años después del Holocausto*, ÁMBITO JURÍDICO, Nov. 5, 2013, https://www.ambitojuridico.com/noticias/administrativo-y-contratacion/el-caso-plazas-vega-28-anos-despues-del-holocausto. At that time, the court encouraged of the International Criminal Court to investigate

Finally, on December 16, 2015, after being incarcerated for nearly nine years for alleged crimes that Plazas Vega did not commit, Colombia's Supreme Court overturned his conviction in its entirety. The Supreme Court declared that "there is no existing evidence that allows us to arrive at certainty about the criminal responsibility of the accused [Plazas Vega], […] since the uncertainty will endure, […] it is not possible to declare him criminally responsible. In this matter the *in dubio pro reo* prevails in favor of PLAZAS VEGA."[23] The Supreme Court added that the testimonies of various witnesses that were key to the 2010 conviction lacked credibility. *Id.*

Although Urán Rojas' passing was not the subject of Plazas Vega's prosecution, which suggests that there was insufficient evidence for such a charge, both this action and the prosecution inevitably involve the same set of facts and issues, which is all that is required to abstain based on comity. *See Tr. Int'l Corp. v. Nagy*, No. 15-80253-CIV, 2017 WL 5248425, at *5 (S.D. Fla. Mar. 28, 2017) ("Thus, it is not necessary, as Plaintiff seems to argue, that identical claims be brought in a case.") (citing *Posner v. Essex*, 178 F.3d 1209, 1222 (11th Cir. 1999) ("although this case and the Bermuda action are not identical, they do involve significantly common issues and parties")). The issue in the criminal case is the same as the one here—the Court will hear evidence and testimony to determine whether Plazas Vega was responsible for a killing or forced disappearance on that day.

Furthermore, in the civil context, as explained above, the 2011 Victims Law also applies to victims of crimes carried out by the military or state forces, including those arising from the 1985 M-19 attack. Between 2009 and 2016, the Colombian government granted a total of 615,560 awards

---

higher-ranking Colombian politicians and officers from 1985, such as the former president Belisario Betancur. *Id.*

[23] *See* Exhibit A, Corte Suprema de Justicia [C.S.J.] [Supreme Court of Justice], Sala de Casación Penal, 15 diciembre 2015, M.P.: Luis Guillermo Salazar Otero, Radicación 38957, Gaceta Judicial [G.J.] (No. 446, p. 355).

totaling the equivalent of approximately $4.6 billion. *See* Exhibit D, Reparations Report, p. 51. Colombia, in efforts to provide reparations to more victims, extended the law's run for another ten years, now expiring in 2031."[24]

This Court should abstain from hearing this case based on the Colombian Supreme Court's decree and Colombia's civil reparations scheme. Rendering a verdict inconsistent with the Supreme Court's decree would be stepping on the toes of the judiciary of the Republic of Colombia, which was better positioned to adjudicate the dispute. In absolving Plazas Vega, Colombia's judicial and administrative processes were consistent with civilized jurisprudence—after all, three levels of courts (*i.e.*, trial court, appellate court, supreme court) reviewed the evidence, arguments, and the record, and the country's highest court made its ruling. Were this case to advance, this Court would be reviewing evidence 14 years after the lower court in Colombia first reviewed it and nearly 40 years after the actual events occurred. Rendering an inconsistent verdict would also imply that Colombia's civil reparations scheme, particularly under the Victims Law, is somehow inadequate. The United States has an interest in encouraging other nations, like Colombia, to resolve and redress their own crises. Colombia has done so. For these reasons, abstention under international comity is proper.

**b. The judgment was not entered by fraud, and Colombia was an adequate forum.**

Oftentimes, to argue against a federal court abstaining from hearing a case based on comity, a plaintiff will claim that the foreign jurisdiction is uncivilized or that the proceedings were obtained by fraud. Here, there is no basis to suggest that the Colombian Supreme Court overturned Plazas Vega's conviction through fraud. Without sufficient evidence to the contrary, the decree is entitled to

---

[24] *Colombia extends Victims' Law until 2031*, JUSTICE FOR COLOMBIA, NOV. 19, 2021, https://justiceforcolombia.org/news/colombia-extends-victims-law-until-2031/.

deference.[25] After all, the Eleventh Circuit has held Colombia to be an adequate forum and the decree in question was from Colombia's highest court. *See, e.g.*, *Paolicelli*, 289 F. App'x at 391. The Colombian Supreme Court closely analyzed the evidence that the lower courts relied upon for the conviction and deemed it unreliable and insufficient. The Colombian Supreme Court's opinion is thorough (300+ pages) and well-reasoned.[26] Colombia was thus an adequate forum.

**c. The foreign judgment was not prejudicial or violative of American public policy notions of what is decent and just.**

The Colombian Supreme Court's judgment absolving Plazas Vega was not prejudicial and did not violate public policy notions of what is decent and just. The Ninth Circuit Court of Appeals in *Mujica* further distilled the factors to be weighed on this element. The Court stated "the (nonexclusive) factors we should consider when assessing United States' interests include (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interest of the United States, and (5) any public policy interests." *Mujica*, 771 F.3d at 604.

The fact that the events occurred in Colombia, and not the United States, weighs heavily in favor of abstention. *See Mujica*, 771 F.3d at 586 ("comity is most closely tied to the question of territoriality"). Unsurprisingly, United States courts have afforded far less weight, for comity

[25] Typically, courts ask whether one side has presented specific evidence that the judgment of the alternative forum was significantly inadequate. *Mujica*, 771 F.3d at 608; *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008) ("In this case, neither party has argued that the Belizean judgments were rendered via fraud or that the Belizean proceedings lacked any element of civilized jurisprudence. We see no evidence that the Belizean judicial system affords litigants treatment that is inconsistent with American notions of due process.").

[26] It is worth noting that Edilberto Sanchez Rubiano, another retired Army colonel convicted of crimes arising from the 1985 M-19 attack, remains in prison to this day. He was convicted in 2021 and sentenced to 40 years alongside the convictions of other lower ranked retired officers. This demonstrates that the Colombian judiciary was not simply freeing all military officials involved in the 1985 attack. Plazas Vega was absolved because there was insufficient reliable evidence supporting his conviction.

purposes, to federal or state interests when the activity at issue occurred abroad. *See id; Torres v. S. Peru Copper Corp.*, 965 F.Supp. 899, 909 (S.D.Tex.1996) (dismissing action under comity where the "activity and the alleged harm occurred entirely in Peru [and] Plaintiffs are all residents of Peru"), *aff'd*, 113 F.3d 540 (5th Cir.1997); *Sequihua v. Texaco, Inc.*, 847 F.Supp. 61, 63 (S.D.Tex.1994) (declining jurisdiction under comity where challenged activity occurred entirely in Ecuador).[27]

United States foreign policy interests also weigh in favor of abstention. Our nation has an interest in encouraging foreign nations like Colombia to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses. *Mujica*, 771 F.3d at 586. Indeed, the U.S. State Department's website states that our country supports the Colombian government's peace initiatives:

> **U.S. Assistance to Colombia**
>
> The U.S. government supports Colombian efforts to transition from conflict towards peace by working in conflict-affected rural areas of Colombia, where violence, drug trafficking, the lack of government presence, and the absence of legal economic opportunities have historically converged. U.S. programs include support for Colombian government initiatives: implementation of Colombian government land reforms; support and protection for vulnerable populations including members of Indigenous and Afro-Colombian communities and human rights defenders; greater educational opportunities; public and private investments; reintegration of ex-combatants; and respect for human rights, social inclusion, and the rule of law.

https://www.state.gov/u-s-relations-with-colombia/. Entertaining this case would undermine Colombia's Victims Law and imply that the United States does not recognize the legitimacy of

[27] *See also Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 49 (2d Cir.2014) (reversing lower court and foreclosing jurisdiction over ATS claims filed by Bangladeshi plaintiff allegedly detained and tortured by Bangladeshi authorities in Bangladesh); s*ee generally Koh*, supra, at 18–19, 51–57 (describing courts' aversion to adjudicating extraterritorially as rooted in principle of national sovereignty).

Colombian institutions and its reparations programs. Such a move would be unwarranted, intrusive, and disrespectful.[28]

This lawsuit might also deter United States investment in Colombia, which would contravene this country's interest in maintaining and improving Colombia's economy. As explained by *Mujica* court, this issue directly affects our nation's national security in combating the drug trade:

> Colombia is one of the United States' closest allies in this hemisphere, and our partner in the vital struggles against terrorism and narcotics trafficking.... Colombia's role in helping to maintain Andean regional security, our trade relationship, and our national interest in the security of U.S. persons and U.S. investments in Colombia, rank high on our foreign policy agenda….Lawsuits such as the one before Judge Rea have the potential for deterring present and future U.S. investment in Colombia…

*Mujica*, 771 F.3d at 586. Thus, our nation's interests weigh in favor respecting Colombia's judiciary and administrative processes by abstaining from hearing this case.[29]

**Conclusion**

The Complaint (Dkt. 1) should be dismissed in its entirety for failing to exhaust administrative remedies or, alternatively, this Court should abstain from hearing this action based on comity.

Dated: May 12, 2022

---

[28] This country's foreign policy interest in upholding human rights has minimal application here. The crimes committed that day have been adjudicated and atoned for in Colombia. And again, the acts occurred almost 40 years ago.

[29] Plazas Vega played a pivotal role in combating the drug trade. Indeed, "[i]n 2002 Colonel Plazas was appointed by then President Alvaro Uribe Velez as the National Director of DNE (Anti-Drugs office). During his administration, he achieved outstanding results against the Colombian drug cartels, the terrorist group FARC and the terrorist group AUC. Under the direction of the Minister of Justice, Fernando Londoño Hoyos, Colonel Plazas' administration was able to confiscate more than two billion pesos in assets, bank accounts, and land." *See The Inter-American Institute for Philosophy, Government, and Social Thought*, https://inter-american.org/colonel-alfonso-plazas-vega/

Respectfully submitted,

**HEISE SUAREZ MELVILLE, P.A.**
1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone (305) 800-4476

By: *_/s/ Mark J. Heise_*
Mark J. Heise
Florida Bar No. 771090
mheise@hsmpa.com
Luis E. Suarez
Florida Bar No. 390021
lsuarez@hsmpa.com
Patricia Melville
Florida Bar No. 475467
pmelville@hsmpa.com
Anthony Perez
Florida Bar No. 1011730
aperez@hsmpa.com

*Attorneys for Defendant Luis Alfonso Plazas Vega*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 12, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF. Copies of the foregoing document will be served on all parties via transmission of Notice of Electronic Filing generated by CM/ECF.

By: *_/s/Mark J. Heise_*
Mark J. Heise